## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

KANAYO DERHEM,                                    )
                                                  )   **Case No.**
    **Plaintiff,**              )
v.                                                )
                                                  )   **COMPLAINT and JURY**
                                                  )   **DEMAND**
BAY HOUSE MIAMI CONDOMINIUM                       )
ASSOCIATION, CHARLES BRUMSTED,                    )
JR., SEAN ZAHNISER, MIKE DESIMONE                 )
JAMES PINKERT, JOSHUA PAUL,                       )
ALEJANDRO ENRIQUE UTRERA BADENES,                 )
JONATHAN FERREIRA, KW PROPERTY                    )
MANAGEMENT, LLC, and JOSE VIDAL                   )
                                                  )
    **Defendants.**             )

---

## I. PRELIMINARY STATEMENT

1. This is an action by Plaintiff Kanayo Derhem pursuant to (1) the **Fair Housing Act of 1968**,

    42 U.S.C. § 3601, et seq. ("FHA"), including (a) housing discrimination based on race and

    gender, including sex stereotyping, gender identity, gender expression and gender non-

    conformity, and (b) retaliation for housing discrimination complaints; (2) the **Civil Rights Act**

    **of 1866 and the Civil Rights Act of 1871**, including (a) 42 U.S.C. § 1981 (contract

    discrimination), 42 U.S.C. § 1982 (property discrimination), 42 U.S.C. § 1983 (civil rights

    discrimination), 42 U.S.C. § 1985 (conspiracy to discriminate), 42 U.S.C. § 1986 (neglect to

    prevent conspiracy to discriminate); (3) supplemental claims under the **Florida Civil Rights**

    **Act**, Fl. St. § 760.01, et seq. ("FCRA"); (4) supplemental claims under the **Florida**

    **Condominium Act**, Fl. St. § 718.101 et seq., et seq. ("Condo Act"); and (5) supplemental

    claims under **state common law**, including breach of contract, breach of fiduciary duty and

misrepresentation. Plaintiff seeks declaratory and injunctive relief to end the harassment and discrimination, in addition to compensatory and punitive damages, and other available relief.

## II.    PARTIES

2.      Plaintiff Kanayo Derhem is a citizen of the United States and a resident of Dade County, Florida.

3.      Defendant Bay House Miami Condominium Association, Inc. ("BHMCA") is a non-profit corporation organized and existing under the law of the State of Florida with its principal address at 600 NE 27th Street, Miami, Florida 33137.

4.      At all times relevant herein, Plaintiff was an owner and resident of unit #2605 (the "Unit") in the residential development owned and operated by Defendant BHMCA at 600 NE 27th Street, Miami, Florida 33137 (the "Development").

5.      KW Property Management, LLC ("KWPM"), with corporate headquarters at 8200 NW 33rd Street, Suite 300, Miami, Florida 33122, was a property manager hired by BHMCA to manage the property during relevant times until approximately January 1, 2020.

6.      The defendants listed below shall be known as the "Individual Defendants" collectively.

7.      Mr. Charles Brumsted, Jr. is and has always been at all relevant times the President of the Board of Directors for Defendant BHMCA.

8.      Sean Zahniser is and has always been at all relevant times the Treasurer of the Board of Directors for Defendant BHMCA.

9.      Mike Desimone is and has always been at all relevant times the Secretary of the Board of Directors for Defendant BHMCA.

10.     James Pinkert is and has been at all relevant times a member of the BHMCA Fining/Grievance Committee.

11.     Joshua Paul was a member of the BHMCA Fining/Grievance Committee at relevant times.

12.     Alejandro Enrique Utrera Badenes was a member of the BHMCA Fining/Grievance Committee at relevant times.

13.     Jonathan Ferreira was a manager employed by BHMCA's management company, Castle Management Co. since at least March of 2020.

14.     Jose Vidal was a manager employed by BHMCA's management company, KW Property Management, LLC until approximately February 1, 2020.

### III.     PROCEDURAL HISTORY

15.     Plaintiff has taken all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

### IV.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 3613, 28 U.S.C. §§ 1331 and 1343 in that this is a civil action seeking to redress the deprivation of the right to fair housing and equal protection secured to the Plaintiffs by the Fair Housing Act and the Civil Rights Acts of 1866 and 1871, and pursuant to 28 U.S.C. § 1337 in that defendants' unfair housing practices create a restraint on commerce; and pursuant to 28 U.S.C. §§ 2201 and 2202 for declaratory and injunctive relief.

17.     The Court has jurisdiction of the state law supplemental claims pursuant to 28 U.S.C. § 1367, which arise out of a common nucleus of operative facts, circumstances, occurrences, witnesses and evidence, and are thereby so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution,

18.     Venue is proper in the United States District Court for the Southern District of Florida

pursuant to 28 U.S.C. §§ 1391(b) because all Defendants are residents of Florida and reside in the

Southern District of Florida, and because a substantial part of the events or omissions giving rise

to the claim occurred in the Southern District of Florida.

## V.     FACTS

19.     Plaintiff is a female citizen of the United States Of America.

20.     Plaintiff has a female gender identity.

21.     Plaintiff has a feminine gender expression.

22.     Plaintiff is a woman who is transgender.

23.     Plaintiff is Black and is of African and African-American descent.

### A. Sex, Gender, Gender Expression, and Gender Identity

24.     *Sex* is a term that includes gender, gender expression, and gender identity within its

meaning.

25.     *Sex stereotyping* refers to the application by an employer of stereotypes related to sex to

restrict, disparage, or discriminate on the basis of an employee's gender expression or identity.

26.     *Gender* refers to cultural expectations specific to the sexes.

27.     *Gender expression* refers to a person's gender-related appearance and behavior, whether

or not stereotypically associated with the person's sex assigned at birth.

28.     *Gender identity* refers to a person's internal sense of sex, being male, female, or other.

29.     Gender identity is intractably rooted at a very early age and cannot be changed.

30.     *Transgender individuals* are people who have a gender identity that does not match the sex

they were assigned at birth.

31.    *Gender transition*. Transgender individuals often seek out legal, social, and medical means of aligning external manifestations of their sex and gender with their gender identity. This process is colloquially known as *gender transition* or *transition*.

32.    Discrimination against transgender people for being transgender is based on their sex, sex stereotyping, gender, gender expression, gender identity, or gender transition.

33.    *Gender dysphoria* is the formal diagnosis used by physicians and psychologists to describe people who experience significant distress with the sex they were assigned at birth.

34.    Gender dysphoria is found in the *Diagnostic and Statistical Manual of Mental Disorders Fifth Edition* of the American Psychiatric Association.

35.    Based on many scientific studies during the past two decades, gender dysphoria has been identified as resulting from a physiological condition of the brain and neurological system.

36.    Scientific studies have shown that transgender persons have brain structures that are typical of non-transgender people with the same gender identity. For example, transgender women (i.e., individuals whose sex assigned at birth is male but who have female gender identity) have brain structures that are similar to those of non-transgender women.

37.    It is appropriate to refer to a transgender woman who has transitioned with female titles, honorifics (e.g., Miss, Ms., or Mrs.), and pronouns (e.g., her, hers, and she).

### B. Discrimination in Housing

### *Discrimination in Purchase of Condominium*

38.    Plaintiff purchased condominium unit #2605 (the "Unit") at Defendant BHMCA's  Development in February 2019.

39.    The Development is a condominium building with 168 individual units, including the Unit occupied by the Plaintiff.

40.     The Development features a number of amenities available for use of the residents, including a swimming pool, a hot tub, a grill, a sun terrace, a fitness center, a business center, a media/ theatre room and other recreation areas (collectively, the "Amenities").

41.     The Development also contains a number of common areas which are necessary to access in order to gain access to the unit: such as hallways, elevators, stairways, a lobby and a parking garage (collectively, "the Common Areas").

42.     The Development employs a number of staff, including a valet service and a 24-hour concierge service.

43.     The Unit is a three-bedroom apartment of approximately 1677 interior square feet and two terraces measuring a combined 296 square feet.

44.     The Unit is on the 26th floor of the Development.

45.     The Unit is a dwelling, as defined within the FHA.

46.     Defendant BHMCA was aware of Plaintiff's race, sex, gender, gender identity, gender expression and gender non-conformity as a result of readily available public information regarding Plaintiff and the extensive background checks performed by Defendant in her purchase of the Unit.

47.     In the process of closing, Defendant BHMCA failed and refused to approve Plaintiff's application in a reasonable amount of time, and without offering a legitimate, non-discriminatory reason for delays.

48.     On information and belief, other applicants similarly situated to Plaintiff, BHMCA approved their applications in less time.

49.     Plaintiff and her closing attorney made numerous attempts to contact Defendant BHMCA and Mr. Brumsted

50.     Mr. Brumsted did not return phone calls or emails, provided no information about his whereabouts or alternate persons to contact in his absence.

51.     Upon information and belief, this was a deliberate effort to dissuade and prevent Plaintiff from proceeding with the closing based upon her race, sex, gender and disability.

52.     Mr. Brumsted's personal purpose for engaging in such actions were to indulge his personal prejudices against Plaintiff's race, gender and perceived disability, and to protect what he perceived to be a threat to his personal property values based on prejudice.

53.     Defendant BHMCA and KWPM were aware of these actions, and tolerated, participated in, condoned and ratified Brumsted's actions.

54.     Mr. Brumsted approved the closing only after direct contact from Plaintiff's attorney, Jodi Strang, on the morning of February 12, 2019. In her contact, Strang advised of the planned filing of an anti-discrimination lawsuit based if Defendant BHMCA failed to respond to Plaintiff. As a result, Mr. Brumsted reluctantly met with Plaintiff that same afternoon.

### *Discriminatory Comments and Actions by Mr. Brumsted towards Plaintiff*

55.     Mr. Brumsted has demonstrated continued hostility against Plaintiff on the basis of her race and gender, and perceived handicap.

56.     At the meeting arranged by Plaintiff's attorney on the afternoon of February 12, 2019, Mr. Brumsted asked Plaintiff in a brusque manner designed and intended to humiliate her "Can you have kids?" He also restated at this time, "this is a family-oriented building," implying that Plaintiff's presence was offensive to families with children.

57.     This was a reference to Plaintiff's sex and gender, as Mr. Brumsted was seeking to verify whether Plaintiff was assigned female at birth.

58.     On December 11, 2019, Mr. Brumsted made a comment referencing Plaintiff, while she and others were standing nearby in the lobby, that "the elevator is taking too long, why doesn't she go and report that as discrimination..."

59.     The import of this remark was to indicate that Plaintiff had made complaints of discrimination, and that such complaints were as ill-founded as a discrimination complaint against the elevator would be. The intent of the remark was to humiliate Plaintiff because of her discrimination complaints and to dissuade her from making further complaints.

60.     Michael Brown, a new owner who is also black, witnessed this event. Mr. Brown was speaking with the Plaintiff at the time of the event.

61.     In regard to Mr. Brown, Mr. Brumsted asked Plaintiff: "Is this another one of your illegal Airbnb's, your illegal renters?"

62.     The import of this question was to assert that the Plaintiff's meeting and association with Mr. Brown was a violation of the condominium's bylaws, and that Mr. Brown's presence in the building was therefore illegal. The design and intent of the remark was to humiliate Plaintiff because of her race, her association with another Black person, and her discrimination complaints, to dissuade her from making further complaints, and to suggest to a third party that she was engaged in criminal, illegal and unsavory behavior.

63.     Plaintiff explained that Mr. Brown was a new owner, with whom he had previously met.

64.     Mr. Brumsted stated that he had not recognized Mr. Brown and apologized to him.

65.     On or around December 11, 2019, and again on December 21, 2019, Mr. Brumsted stated to Plaintiff in the presence of others that she is "a disgrace to the building".

66.    On or around December 12, 2019, Mr. Brumsted referred to Plaintiff as a "monkey" following a meeting of the condominium's Grievance Committee.

67.    Plaintiff was not allowed to speak to dispute the fines brought against her.

68.    "Monkey" and other comparisons to primates is a well-known racial slur denigrating the humanity of Black people.

69.    Mr. Brumsted intended to denigrate and humiliate Plaintiff by means of this remark, and to improperly influence the Grievance Committee to implement discriminatory fines against Plaintiff .

70.    Mr. Brumsted also made comments and took actions designed and intended to make life at BHMCA difficult for Plaintiff because of his animus based on race, gender and disability. For example, he told Plaintiff "you are not allowed to have roommates," but  stated that he aided a neighbor not in Ms. Derhem's protected categories in his official capacity to have roommates because he "likes those guys."

71.    BHMCA was aware of and perpetuated, condoned  and/or ratified Mr. Brumsted's pattern of discriminatory conduct, despite repeated specific complaints to BHMCA.

72.    The other Individual Defendants were aware of and perpetuated, condoned  and/or ratified Mr. Brumsted's pattern of discriminatory conduct, despite repeated specific complaints of which they were aware

### _Discriminatory Comments and Actions by Mr. Vidal towards Plaintiff_

73.    Mr. Jose Vidal, a manager employed by BHMCA's management company,  working on location at BHMCA, has demonstrated continued hostility against Plaintiff on the basis of her race, gender, and perceived handicap.

74.     For example he wrote a text message regarding Plaintiff that he sent to her guest, stating regarding Plaintiff: "I try to avoid her at all cost" and "my staff dislikes her."

75.     Plaintiff's guest advised Plaintiff that Mr. Vidal, Mr. Brumsted and the association's attorney had said to the guest that they intended to "get you," referring to Plaintiff, and intended "to take your home," referring to taking damaging actions against Plaintiff.

76.     When Plaintiff asked him a question in his office, Mr. Vidal yelled and cursed at her, and called the police to have her forcibly removed.

77.     Mr. Vidal was told by the police that this was not a legitimate reason to call the police.

78.     Mr. Vidal showed Plaintiff a picture of her that he had researched on the internet prior to her gender transition, of which Plaintiff was unaware, and indicated by facial expression, body language and gestures that he was calling into question her femininity.

79.     Additionally, Mr. Vidal instructed his staff to harass the Plaintiff and her guests.

80.     He encouraged his staff to disrespect the Plaintiff and to refuse her services.

81.     He attempted to interfere with her ability to stand for election as a Board member, including failing to mail the Plaintiff's board election registration form, and ignoring her requests for vital information regarding elections.

82.     Mr. Vidal's personal purpose for engaging in such actions was to indulge his personal prejudices against Plaintiff's race, gender and perceived disability and to fulfill Mr. Brumsted, BHMCA and defendant's directives.

83.     Defendant BHMCA was aware of these actions and tolerated, participated in, condoned and ratified Brumsted's actions.

84.     KWPM was aware of and perpetuated, condoned  and/or ratified Mr. Vidal's pattern of discriminatory conduct, despite repeated specific complaints to KWPM.

85.     The other Individual Defendants were aware of, perpetuated, condoned  and/or ratified Mr. Vidal's pattern of discriminatory conduct, despite repeated specific complaints of which they were aware

### *Misuse of Violations System Targeting Plaintiff*

87.     In or about July or August 2019, Plaintiff's reasonable access to her Unit and the Amenities were denied, through deactivation by BHMCA and Defendants Brumsted, Zahniser and Desimone, of the fob key issued to her as an owner, without good reason or justification, in violation of Defendant BHMCA's Rules & Regulations and in derogation of her rights as an owner of a unit.

88.     Plaintiff contacted management to determine the grounds for this denial of access and was refused any explanation.

89.     Given the erratic and discriminatory behavior of Mr. Brumsted, Mr. Zahniser and Mr. Desimone, Plaintiff decided that it would be in the best interests of the condominium owners, if she were to run for election to the Board of Directors.

90.     Plaintiff filed documents on October 17, 2019, with the condominium in preparation for her run for the Board.

91.     Plaintiff emailed Mr. Vidal and Mr. Brumsted requesting information about how to run for the Board. Those emails went unanswered.

92.     Mr. Vidal and Mr. Brumsted attempted to thwart Plaintiff's board candidacy, ignoring her emails, failing to mail the Plaintiff's board election registration form, and by changing

Plaintiff's name on the ballot so as to misrepresent Plaintiff's name and confuse voters by using her maiden name.

93.     The rules of the Development stipulate that an individual cannot run for Board of Directors if they have unpaid fines for violations.

94.     Plaintiff was later informed that, at a meeting of the Board of Directors on October 22, 2019, Mr. Brumsted, Mr. Zahniser and Mr. Desimone approved $2100 in fines against Plaintiff.

95.     The rules of the Development stipulate that denial of access cannot occur until 90 days of delinquency have passed.

96.     On December 28, 2019, Sara Lopera, acting on behalf of BHMCA and KWPM, blocked Plaintiff's access to the condo unit, parking garage, front door, all doors and amenities. They did this by deactivating her key fob.

97.     As a result, Plaintiff was forced to walk down the stairs to exit.

98.     She left the building and used the callbox to ask the front desk to let her in. The front desk refused to let her in to access the elevator. As a result, Plaintiff was forced to climb 26 stories to her unit.

99.     90 days of delinquency had not yet passed at the time that reasonable access to her Unit and the Amenities was denied by deactivation of her fob key.

100.    The fines were imposed without a legitimate, nondiscriminatory reason.

101.    The reason the fines were imposed was for the purpose of discrimination against Plaintiff based on race, sex and disability, and in advancement of their scheme to discriminate against the Plaintiff, to implement fines as leverage toward a potential foreclosure proceeding

and to gain possession of her unit in foreclosure, as well as to block her from running for a Board position.

102.    In order to regain access to her Unit and the Amenities, Plaintiff was forced to pay these discriminatory fines that were imposed with discriminatory intent.

103.    On December 16, 2019, five days after she filed documents with the condominium in preparation for her run for the Board, Plaintiff received four letters from Defendant Jose Vidal imposing fines for various alleged violations and advising her to appear before the Fining/Grievance Committee, consisting of Defendants Pinkert and Ms. Elizabeth Perez, for a hearing on December 30, 2019.

104.    These proposed fines were without merit, and known to Defendants to be without merit.

105.    For example, the first letter stated that she had received a proposed $100 fine "for attempting".

106.    It is unclear to what this referred.

107.    Two of the letters charged her for having a dog without a leash in the elevator, for which a fine of $100 was sought.

108.    Upon information and belief, Defendants first became aware of these incidents upon reviewing elevator video for the purpose of targeting the Plaintiff in an attempt to find violations with which they could charge Plaintiff so that she could not serve on the Board, and to make life at BHMCA hard for Plaintiff to advance their discriminatory scheme.

109.    The first letter related to an incident in which Plaintiff's dog unintentionally escaped the Unit and was retrieved without incident.

110.    The second letter related to an incident in which Plaintiff was not holding a leash due to a shoulder injury, for which she provided medical documentation to Defendants BHMCA and Brumsted.

111.    Other residents, not in Plaintiff's protected categories, have taken their dogs without a leash in the elevator and other Common Areas, of which Defendants were aware, and these residents were not charged with a violation.

112.    Another letter imposed a $1000 fine on Plaintiff, alleging she had a minimum of ten violations for "having an unapproved person living in the unit for more than 21 days."

113.    This was patently untrue, because Plaintiff notified Defendant BHMCA of her guest's visit on November 2, 2019 and notified them to add her to the guest list as an "approved guest."

114.    Plaintiff subsequently notified Defendant BHMCA on November 21, 2019 that her guest would be leaving on November 23, 2019 and returning on November 24 or 25.

115.    Thus, Plaintiff's guest was not an "unapproved guest."

116.    Defendant BHMCA had no reasonable basis on which to disapprove of Plaintiff's guest.

117.    The alleged violations were all meritless, and were known to Defendants to be meritless.

118.    The Committee, including Individual Defendants, prosecuted these meritless violations and imposed fines because of Plaintiff's race, gender and perceived disability, and in retaliation for her complaints.

119.    Defendants engaged in a pattern of heightened scrutiny of Plaintiff in order to find violations not enforced against other owners not in Plaintiff's protected categories, intended and designed to advance their discriminatory schemes.

120.    Defendants imposed fines upon Plaintiff because of her protected categories and in retaliation for her discrimination complaints.

121.    Defendant BHMCA engaged in selective prosecution based on the Plaintiff's race, gender and perceived disability because Defendant was aware that other owners, not in Plaintiffs' protected categories, had engaged in similar behavior but did not allege violations against those owners.

122.    The alleged violations and proposed fines were lodged in order to disqualify Plaintiff for Board service, as well as to make her life at BHMCA as difficult as possible, because of her race, sex and disability and in retaliation for her complaints of discrimination.

123.    Defendant BHMCA was aware of these actions, and tolerated, participated in, condoned and ratified the discriminatory actions.

124.    KWPM was aware of and perpetuated, condoned and/or ratified this discriminatory conduct, despite repeated specific complaints to KWPM.

125.    The other Individual Defendants were aware of, perpetuated, condoned and/or ratified this discriminatory conduct, despite repeated specific complaints of which they were aware.

### *Harassment Regarding Board Elections*

126.    Plaintiff ran for the Board of Directors in an election held on December 11, 2019.

127.     On December 6, 2019, Plaintiff received an anonymous email disparaging her, signed "BAY HOUSE OWNERS SINCE 2015" which was sent to several other neighbors in the building.

128.     In this email, Plaintiff was falsely accused of being late on her condo dues and threatened with foreclosure.

129.     Plaintiff was also falsely alleged to have been investigated by the police at the Unit.

130.     Plaintiff was described as "not good for our values", which was followed by the statement "Children live here."

131.     The references to "our values" and "children" were a reference to dislike for Plaintiff's sex, gender, gender identity, gender expression and gender non-conformity.

132.     Plaintiff requested this individual to stop harassing her, and denied the false allegations.

133.     In response, the anonymous owner referred to her as a "stalker," which was a reference to alleged criminal activity.

134.     The email then included a statement contrasting her behavior with the "professional and classy" behavior of Mr. Brumsted and the Board of Directors, which was a reference to Plaintiff as unprofessional and déclassé.

135.     Plaintiff found these emails unwelcome and offensive based on her race and gender, as well as physically threatening, creating fear for her physical safety and emotional distress.

136.     Plaintiff notified Defendants Brumsted and Defendant Vidal and Defendant BHMCA of these emails.

137.     These Defendants did not take prompt and effective action to stop this harassments.

138.    Upon information and belief, these Defendants supplied the emails to the BHMCA community.

139.    Plaintiff reasonably believed these false allegations were intended to threaten her and to dissuade her from standing for election and to dissuade others from supporting her.

140.    As a result, Plaintiff and Plaintiff's family feared for her safety and for the safety of her guests.

### *Discriminatory Treatment of Plaintiff's Guests and Family Members*

141.     On December 21, 2019, Sara, a member of BHMCA staff at the front desk not in Plaintiff's protected categories, refused to serve Plaintiff, and stated "we don't provide concierge services to you."

142.    This reference to "concierge service" was a reference to the fact that the BHMCA staff was unwilling to serve Plaintiff because of her race and sex and because she had made discrimination and safety complaints.

143.    On December 25, 2019, in the presence of Plaintiff's mother, Sara again made a statement to the same effect.

144.    Sara also stated that her superiors were aware of her behavior and that they condoned it.

145.    On December 27, 2019, Sara made a similar statement to Plaintiff in front of a third party.

146.    At this time, Defendant Brumsted came to the lobby.

147.    Plaintiff asked Mr. Brumsted to provide support to Plaintiff as an owner deserving of services.

148.    In response, Mr. Brumsted explicitly condoned her statement, stating "I won't get involved."

149.    On numerous occasions, including but not limited to September 14, 2019, November 8, 2019, December 25, 2019, and December 30, 2019, Plaintiff's guests were interrogated by Defendant BHMCA's staff members in a hostile and defamatory manner in a manner intended and calculated to humiliate and embarrass Plaintiff.

150.    For example, they have made statements and posed questions to Plaintiff's guests such as

    a.   "You are not even supposed to be here"

    b.   "You're an illegal Airbnb"

    c.   "How much did you pay to be here?"

    d.   "I don't know what kind of business she's running up there"

    e.   "This is a family place...you're not welcome here"

    f.   "Children live here"

    g.   "You make this place look bad; I'm a classy guy"

    h.   "How long are you staying here?"

    i.   "Don't you know she is behind on her dues?"

    j.   "Don't you know she's about to get foreclosed on?";

    k.   "Don't you know they're about to take her house?"

    l.   "None of my staff likes her"

    m.   "She's a disgrace to the building"

    n.   "She tried to sue her other building"

151.    Defendant Brumsted encouraged Sara to aggressively and negatively engage with the Plaintiff in an effort to try to catch the Plaintiff in some sort of wrongdoing so that BHMCA could then impose more fines against her, report her to the authorities, and/or further engage in his scheme to defame the Plaintiff, discriminate against her, retaliate against her, deny her peaceful

enjoyment of her home and to fraudulently create discriminatory fines as cause of action for foreclosure and repossession of her home.

152.    For example, Sara sent security up to Plaintiff's unit and demanded that Plaintiff's nail technician, who had arrived to do her nails, be removed from the premises.

153.    Sara also called the police and lied to them about Plaintiff, stating that Plaintiff was not the owner of the unit.

154.    Defendant Brumsted was aware of these facts and circumstances but nonetheless allowed and encourage them to continue in order to harm Plaintiff.

155.    The reason for these statements and interrogations was to harass and intimidate Plaintiff because of her race, sex and perceived disability, and because of making discrimination complaints.

156.    Plaintiff notified Defendants BHMCA and KWPM of the harassing actions and statements set forth above, but BHMCA failed to acknowledge or to take prompt and effective action to stop the harassment.

157.    Despite the dozens of complaints that Plaintiff made concerning the harassment, safety and discrimination against her, her family members and her guests, the hostility still continues.

158.    Defendant BHMCA was aware of these actions, and tolerated, participated in, condoned and ratified these actions.

159.    KWPM was aware of and perpetuated, condoned  and/or ratified this discriminatory conduct, despite repeated specific complaints to KWPM.

160.    The other Individual Defendants were aware of, perpetuated, condoned  and/or ratified this discriminatory conduct, despite repeated specific complaints of which they were aware.

***Discriminatory Treatment of Plaintiff's Short Term Rentals***

161.    Defendant BHMCA's representative represented, on two separate occasions, that owners would be able to earn income by means of short-term rentals.

162.    Defendant BHMCA's representative knew or should have known that this representation was false or misleading.

163.    Plaintiff purchased her unit based, in large part, on the understanding and representation of Defendant BHMCA that earning income, by means of short term rentals, would be permitted. This representation was material to the Plaintiff's home-purchase transaction. Defendant BHMCA intended that the representation induce Plaintiff to enter into the purchase transaction.

164.    Nothing in any Bay House governing document or regulation prohibited such short term renting. After Plaintiff purchased her condominium unit in reliance on the representations and governing documents pertaining to short-term rentals, Bay House adopted new Rules and Regulations prohibiting Airbnb rentals.

### CAUSES OF ACTION

### COUNT 1
**Housing Harassment and Hostile Work Environment on the Basis of Race, Gender and Perceived Disability**
**42 U.S.C. § 3601, et seq. and 24 CFR § 100.600, et seq.**
**[As to all Defendants]**

165.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth herein.

166.    Plaintiff is a member of a protected category with regard to race.

167.    Plaintiff is a member of a protected category with regard to sex and gender, including sex stereotyping, gender expression, gender nonconformity, and gender identity.

168.    Defendants regarded Plaintiff as having gender dysphoria, and perceived this as a handicap.

169.    Defendants instituted, participated in, were aware of, condoned and/or ratified a campaign of harassment and discrimination because of and motivated by race, sex and gender (including sex stereotyping, gender expression, gender non-conformity, and gender identity), and because of and motivated by handicap.

170.    This harassment was related to and in connection with the availability, sale, rental, and use or enjoyment of Plaintiff's dwelling, and the terms, conditions, and privileges of the sale and rental thereof, and the provision and enjoyment of services and facilities, and the availability, terms, and conditions of a residential real estate-related transaction.

171.    Plaintiff was targeted for harassment by the Defendants because of her race, sex and gender, including sex stereotyping, gender expression, and gender non-conformity, and because of handicap.

172.    Defendants Brumsted and Vidal made statements regarding Plaintiff that were derogatory based on her race, sex and gender (including sex stereotyping, gender expression, gender non-conformity, and gender identity), and handicap.

173.    All Defendants engaged in acts and statements that, although otherwise seemingly neutral with regard to race, gender and perceived disability, were intended to harass Plaintiff based on race, gender and perceived disability, by making circumstances at BHMCA so difficult and intolerable for Plaintiff that she would leave the development, all because Defendants held animus against Plaintiff's race, gender and perceived disability.

174.    The other Defendants acted in concert with Defendants Brumsted and Vidal to perpetuate, condone and/or ratify the hostile environment based on race, gender and perceived disability.

175.    This harassment was and is severe and pervasive.

176.    This hostile environment unreasonably interfered with Plaintiff's reasonable enjoyment of her property.

177.    The hostile environment began at the time Plaintiff sought to purchase the unit, and continued after her purchase to the present time.

178.    The effects of the hostile environment alleged herein were pervasive because they were felt by Plaintiff daily. Plaintiff felt daily humiliation and despair as a result of her reasonable fear of continued harassment at any moment.

179.    Defendants' actions occurred because of Plaintiff's race, sex and gender (including sex stereotyping, gender expression, gender nonconformity, and gender identity), and perceived disability.

180.    Defendant's actions also occurred because of retaliation against Plaintiff based on her reasonable and good faith complaints of discrimination as detailed above.

181.    Defendants acted intentionally or in a manner deliberately indifferent to the rights of Plaintiff.

182.    Defendants BHMCA and KWMP, as the owner and operator of the property, respectively, are liable for the violation of Plaintiffs' rights because, at all times relevant hereto, Defendants Charles Brumsted and Jose Vidal were acting (a) at the express direction of, and/or (b) with the consent of, and/or (c) under the control and supervision of, and/or (d) within his authority as an agent of these Defendants.

183.    Defendants Brumsted and Vidal are liable for the violation of Plaintiff's rights because of their discriminatory and harassing behavior towards Plaintiff.

184.    The other Defendants are liable for the violation of Plaintiff's rights because of their acting in concert with Defendants BHMCA, KWMP, Brumsted and Vidal to tolerate,

perpetuate, ratify and condone the harassment and discrimination, of which they were aware and in which they participated.

185.     As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to humiliation, loss of enjoyment of life, emotional distress, damage to her reputation, and other pecuniary and non-pecuniary losses.

**COUNT 2**
**Discrimination in Contracts on the Basis of Race, Gender and Perceived Disability**
**42 U.S.C. § 1981**
**[GOOD FAITH ARGUMENT FOR EXTENSION,**
**MODIFICATION OR REVERSAL OF LAW]**
**[As to All Defendants]**

186.     Under Section 1981 of the Civil Rights Act of 1866, "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C § 1981(a).

187.     Defendants' actions did not accord Plaintiff the right to make contracts and the right to full and equal benefits as is enjoyed by other citizens.

188.     Defendants' actions did not accord Plaintiff the right to make contracts and the right to full and equal benefits as is enjoyed by white citizens.

189.     Defendants' actions constituted a disparity in treatment between Plaintiff and other citizens, including white citizens, in regard to contracts and benefits.

190.     Defendants' actions were because of and motivated by Plaintiff's race, sex and gender (including sex stereotyping, gender expression, gender nonconformity and gender identity) and perceived disability.

191.     Defendants' discriminatory actions facially based on sex and perceived disability were motivated by race.

192.     Because of Plaintiff's race, she was not considered sufficiently female.

193.     Because of Plaintiff's race, she was regarded as having a disability.

194.     Defendants' discriminatory actions were intentional.

195.     Defendants excluded the Plaintiff from enjoying an environment free from a hostile and intimidating environment based on race.

196.     Defendants retaliated against Plaintiff for making reasonable and good faith complaints about her right to make contracts and the right to full and equal benefits.

197.     Defendants BHMCA and KW Property Management, as the owners and operators of the property, are liable for the violation of Plaintiffs' rights under 42 U.S.C. §§ 1981 because, at all times relevant hereto, the Individual Defendants were acting (a) at the express direction of, and/or (b) with the consent of and/or (c) under the control and supervision of, and/or (d) within authority as an agent of Defendant BHMCA and/or KW Property Management.

198.     Defendants' conduct in discriminating and retaliating against Plaintiff due to her race, sex and perceived disability was intentional.

199.     Defendants engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of Plaintiff.

200.     As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to humiliation, loss of enjoyment of life, emotional distress, damage to her reputation, and other pecuniary and non-pecuniary losses.

**COUNT 3**
**Discrimination in Property on the Basis of Race, Gender and Perceived Disability**
**42 U.S.C. § 1982**
**[GOOD FAITH ARGUMENT FOR EXTENSION,**
**MODIFICATION OR REVERSAL OF LAW]**
**[As to All Defendants]**

201.   Under Section 1982 of the Civil Rights Act of 1866, "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property." 42 U.S.C § 1982.

202.   Defendants' actions did not accord Plaintiff the right to purchase, lease, or otherwise hold or convey real property as is enjoyed by other citizens.

203.   Defendants' actions did not accord Plaintiff the right to purchase, lease, or otherwise hold or convey real property as is enjoyed by white citizens.

204.   Defendants' actions constituted a disparity in treatment between Plaintiff and other citizens, including white citizens, in regard to purchase, lease, or otherwise holding or conveying real property.

205.   Defendants' actions were because of and motivated by Plaintiff's race, sex and gender (including sex stereotyping, gender expression, gender nonconformity and gender identity) and perceived disability.

206.   Defendants' discriminatory actions facially based on sex and perceived disability were motivated by race.

207.   Because of Plaintiff's race, she was considered a gender non-conforming female.

208.   Because of Plaintiff's race, she was regarded as having a perceived disability.

209.   Defendants' discriminatory actions were intentional.

210.    Defendants excluded the Plaintiff from enjoying an environment free from a hostile and intimidating environment based on race.

211.    Defendants retaliated against Plaintiff for making reasonable and good faith complaints about her right to purchase, lease, or otherwise hold or convey real property.

212.    Defendants BHMCA and KW Property Management, as the owners and operators of the property, are liable for the violation of Plaintiffs' rights under 42 U.S.C. §§ 1981 because, at all times relevant hereto, the Individual Defendants were acting (a) at the express direction of, and/or (b) with the consent of and/or (c) under the control and supervision of, and/or (d) within authority as an agent of Defendant BHMCA and/or KW Property Management.

213.    Defendants' conduct in discriminating and retaliating against Plaintiff due to her race, sex and perceived disability was intentional.

214.    Defendants engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of Plaintiff.

215.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to humiliation, loss of enjoyment of life, emotional distress, damage to her reputation, and other pecuniary and non-pecuniary losses.


**COUNT 4**
**Conspiracy to Deny Equal Protection**
**of the Laws on the Basis of Race, Gender and Perceived Disability**
**42 U.S.C. § 1985(3)**
**[As to all Defendants]**


216.    Under Section 1985(3) of the Civil Rights Act of 1866,

> If two or more persons in any State or Territory conspire…for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws…; in

any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

217.    Defendants communicated with one another in person, by telephone and by email regarding Plaintiff and the purchase and management of her Unit.

218.    Defendants each were aware of statements and actions by other Defendants regarding Plaintiff's race, gender and perceived disability.

219.    Upon information and belief, Defendants' communications with one another included communications regarding Plaintiff's race, gender and perceived disability.

220.    Upon information and belief, Defendants' communications with one another included communications regarding Plaintiff's complaints regarding safety and discrimination based on race, gender and perceived disability.

221.    In these communications, each Defendant conspired with at least one other Defendant to deprive Plaintiff of the equal protection of the laws and equal privileges and immunities of citizens, as set forth above in detail.

222.    Defendants' conspiracy was because of and motivated by Plaintiff's race, sex and gender (including sex stereotyping, gender expression, gender nonconformity and gender identity) and disability.

223.    Defendants' conspiracy was designed and intended to interfere with Plaintiff's right to purchase property, engage in contracts, enjoy her property without unreasonable interference, and to be free from harassment and discrimination based on race, gender and perceived disability.

224.    Acts in furtherance of the conspiracy were committed by one or more Defendants.

225.     Each Defendant was aware of at least one act in furtherance of the conspiracy.

226.     Plaintiff was injured in her person and property as a result of these acts in furtherance.

227.     Defendants' discriminatory actions facially based on sex and perceived disability were motivated by race.

228.     Because of Plaintiff's race, she was considered a gender non-conforming female.

229.     Because of Plaintiff's race, she was regarded as having a disability.

230.     Defendants engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of Plaintiff.

231.     As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to humiliation, loss of enjoyment of life, emotional distress, damage to her reputation, and other pecuniary and non-pecuniary losses.

## COUNT 5
### Action for Neglect to Prevent Conspiracy
### to Deny Equal Protection of the Laws on the Basis of Race, Gender and Perceived Disability
### 42 U.S.C. § 1986
### [As to all Defendants]

232.     Under Section 1986 of the Civil Rights Act of 1866,

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented …

233.     Defendants each had knowledge that other Defendants conspired to commit wrongs mentioned in 42 U.S.C. § 1985.

234.   Defendants each had power to prevent or aid in preventing the commission of these wrongs.

235.   Defendants each could have prevented such wrongful acts from occurring by reasonable diligence.

236.   Defendants each neglected to take action to prevent or aid in preventing the commission of these wrongs.

237.   On the contrary, each Defendant actively participated in, condoned and/or ratified these wrongs.

238.   As a direct and proximate result of Defendants' neglect to take action to prevent or aid in preventing the commission of these wrongs, Plaintiff incurred damages including but not limited to humiliation, loss of enjoyment of life, emotional distress, damage to her reputation, and other pecuniary and non-pecuniary losses.

**COUNT 6**
**Discrimination in Housing on the Basis of Race, Gender and Perceived Disability**
**Supplemental Claim - Fl. St. 760.01 et seq.**
**[As to all Defendants ]**

239.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth herein.

240.   Plaintiff is a member of a protected category with regard to race.

241.   Plaintiff is a member of a protected category with regard to sex and gender, including sex stereotyping, gender expression, gender nonconformity, and gender identity.

242.   Defendants regarded Plaintiff as having gender dysphoria, and perceived of this as a handicap.

243.   Defendants instituted, participated in, were aware of, condoned and/or ratified a campaign of harassment and discrimination because of and motivated by race, sex and gender (including sex

stereotyping, gender expression, gender non-conformity, and gender identity), and because of and motivated by handicap.

244.     This harassment was related to and in connection with the availability, sale, rental, and use or enjoyment of Plaintiff's dwelling, and the terms, conditions, and privileges of the sale and rental thereof, and the provision and enjoyment of services and facilities, and the availability, terms, and conditions of a residential real estate-related transaction.

245.     Plaintiff was targeted for harassment by the Defendants because of her race, sex and gender, including sex stereotyping, gender expression, and gender non-conformity, and because of handicap.

246.     Defendants Brumsted and Vidal made statements regarding Plaintiff that were derogatory based on her race, sex and gender (including sex stereotyping, gender expression, gender non-conformity, and gender identity), and handicap.

247.     The other Defendants acted in concert with Defendants Brumsted and Vidal to perpetuate, condone and/or ratify the hostile environment based on race, gender and perceived disability.

248.     This harassment was and is severe and pervasive.

249.     This hostile environment unreasonably interfered with Plaintiff's reasonable enjoyment of her property.

250.     The hostile environment began at the time Plaintiff sought to purchase the unit, and continued after her purchase to the present time.

251.     The effects of the hostile environment alleged herein were pervasive because they were felt by Plaintiff daily. Plaintiff felt daily humiliation and despair as a result of her reasonable fear of continued harassment at any moment.

252.    Defendants' actions occurred because of Plaintiff's race, sex and gender (including sex stereotyping, gender expression, gender nonconformity, and gender identity), and perceived disability.

253.    Defendants' actions also occurred because of retaliation for Plaintiff's reasonable and good faith complaints of discrimination.

254.    Defendants acted intentionally or in a manner deliberately indifferent to the rights of Plaintiff.

255.    Defendants BHMCA and KWMP, as the owner and operator of the property, respectively, are liable for the violation of Plaintiffs' rights because, at all times relevant hereto, Defendants Charles Brumsted and Jose Vidal were acting (a) at the express direction of, and/or (b) with the consent of, and/or (c) under the control and supervision of, and/or (d) within his authority as an agent of these Defendants.

256.    Defendants Brumsted and Vidal are liable for the violation of Plaintiff's rights because of their discriminatory and harassing behavior towards Plaintiff.

257.    The other Defendants are liable for the violation of Plaintiff's rights because of their acting in concert with Defendants BHMCA, KWMP, Brumsted and Vidal to tolerate, perpetuate, ratify and condone the harassment and discrimination, of which they were aware and in which they participated.

258.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to humiliation, loss of enjoyment of life, emotional distress, damage to her reputation, and other pecuniary and non-pecuniary losses.

**COUNT 7**
**Violation of Rights of Condominium Owner**
**Supplemental Claim - Breach of Contract and Fl. St. 718.101, et seq.**
**[As to Defendant Charles Brumsted, Jr.]**

259.   On December 9,10, 2019 and before, Plaintiff properly submitted, in writing, to Bay House Miami Condominium Association, Inc. ("Bay House") her requests for certain documents and records.

260.   Bay House did not respond to Plaintiff's requests for documents and records, and has not made the same available to her for inspection.

261.   Plaintiff and various attorneys have followed up with Bay House multiple times demanding the documents and records.

262.   Bay House refused to tender or make available for inspection the items requested.

263.   Months after the request, the management company sent an email on January 30, 2020, indicating that documents could be reviewed, but not specifying the means of access.

264.   Pursuant to the Bay House Bylaws: "A Unit Owner who is denied access to official records is entitled to the actual damages or minimum damages for the Association's willful failure to comply. Minimum damages shall be $50 per calendar day up to 10 days, the calculation to begin on the 11th working day after receipt of the written request. The failure to permit inspection of the Association records as provided herein entitles any person prevailing in an enforcement action to recover reasonable attorney's fees from the person in control of the records who, directly or indirectly, knowingly denied access to the records."

265.   Defendant Brumsted is the President of Bay House, and is and was in control of the records requested.

266.   Defendant Brumsted denied Plaintiff access to such records.

267.     Defendants Brumsted BHMCA are in breach of the Bay House Bylaws.

268.     It has been determined by the Florida Department of Business and Professional Regulation that "the Division has determined that the Association is in violation for failing to provide access, and we are moving forward with requesting Administrative Actions".

WHEREFORE, Plaintiff, Ms. Kanayo Derhem requests this Court enter judgment against Charles Brumsted, Jr., award damages of five hundred dollars, award attorneys' fees and costs, and for any and all other relief this Court deems just and proper.

**COUNT 8**
**Violation of Rights of Condominium Owner**
**Supplemental Claim - Breach of Contract and Fl. St. § 718.303**
**[As to Defendants BHMCA, Charles Brumsted, Jr., James Pinkert,**
**Alejandro Enrique Utrera Badenes, and Joshua Paul (Separately)]**

269.     On March 19, 2020 Bay House held a Fining/Grievance Committee Hearing to decide whether or not to levy various fines against Plaintiff.

270.     James Pinkert, Alejandro Enrique Utrera Badenes, and Joshua Paul (collectively "Committee") were the members of the 3 (three) person Fining/Grievance Committee.

271.     The March 19, 2020 hearing was the second hearing conducted on these matters.

272.     The previous Fining Committee Hearing was held on December 30, 2019 and was made up of only 2 (two) members, James Pinkert and Elizabeth Perez, in violation of Florida Statute 718.303.

273.     The December 30, 2019 Fining Committee did not afford Plaintiff an opportunity to be heard and elected to table the matter of Plaintiff's fines.

274.     Defendant James Pinkert was the only member of the Committee that imposed the fines on Plaintiff that also sat on December 30, 2020 Fining Committee.

275.    After the previous Fining Committee tabled the matter of Plaintiff's fines, Bay House President, Charles Brumsted, Jr., aggressively berated the 2 (two) committee members saying "You let that monkey walk all over you… two is not enough… I need to add more to the committee…" followed by coaching and ordering the committee to impose the fines next time and without allowing the Plaintiff an open forum to refute or defend against the fines.

276.    Elizabeth Perez expressed concerns and discontent with Charles Brumsted, Jr.'s orders and was subsequently removed from the committee. She specifically expressed concern about not being able to "see the picture [evidence]" that the HOA had brought against Plaintiff. To which Mr. Brumsted responded: "all you need to do is to implement the fine--that's it; implement the damn fine!"

277.    The Committee acting on behalf of Bay House on March 20, 2020, with 2 (two) newly appointed members, Alejandro Enrique Utrera Badenes, and Joshua Paul, imposed the fines against Plaintiff.

278.    At the March 20, 2020 hearing, Plaintiff was not afforded the opportunity to be heard because the Committee incorrectly said she was given the opportunity to be heard at the prior hearing.

279.    Contrary to this assertion, Plaintiff was not given any opportunity to be heard on these new matters at the previous hearing, and she made the Committee aware of this, and her right to do so under Florida law.

280.    Despite being made aware of these facts and Florida statutes, the Committee refused to allow Plaintiff to be heard, refused to take any meeting minutes of the March 20, 2020 hearing, and entered all fines against Plaintiff.

281.    The Bay House Bylaws and Florida Statutes afford Plaintiff the right to be heard before the committee prior to entering fines against her.

282.    Bay House, Charles Brumsted, Jr., the Committee members, and Ferreira acted in bad faith, jointly and severally as alleged maliciously, illegally, willfully, intentionally, and knowingly breaching the Bay House Bylaws and Florida Statutes by refusing to allow Plaintiff and opportunity to be heard and entering various fines against her.

283.    As a result of the actions by the Defendants, Plaintiff suffered damage in the form of fees, fines, liens, attorneys' fees and costs, and emotional distress.

WHEREFORE, Plaintiff, Kanayo Derhem, requests this Court enter judgment against each respective Defendant James Pinkert, Alejandro Enrique Utrera Badenes, and Joshua Paul, award damages in the amount of the total amount of fines entered against her, punitive damages, attorneys' fees and costs, and for any and all other relief this Court deems just and proper.

**COUNT 9**
**Violation of Rights of Condominium Owner**
**Supplemental Claim - Fl. St. § 760.37**
**[As to Defendants BHMCA, Charles Brumsted, Jr., James Pinkert,**
**Alejandro Enrique Utrera Badenes, and Jonathan Ferreira (Separately)]**

284.    It is unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise of, or on account of her or his having exercised, or on account of her or his having aided or encouraged any other person in the exercise of any right granted under ss. 760.20-760.37. This section may be enforced by appropriate administrative or civil action.

285.    Charles Brumsted, Jr., President of Bay House, continuing his discriminatory actions and policies targeting Plaintiff, facilitated the appointment of James Pinkert, Joshua Paul, and Alejandro Enrique Utrera Badenes to Fining Committee for sole purpose of, with instruction, and understanding of continuing his coercing, intimidating, threatening, and interfering with Plaintiff's

rights under Florida Statute 760, his scheme of discrimination against Plaintiff, and his retaliation against Plaintiff for her previous reasonable good faith attempts to exercise her rights.

286.   Plaintiff's numerous requests to be a member of this committee was ignored by Mr. Brumsted and Mr. Vidal.

287.   Defendants, Jonathan Ferreira ("Ferreira"), James Pinkert, Joshua Paul, and Alejandro Enrique Utrera Badenes, attended a Fining Committee Hearing on March 20, 2020, which was to determine the entry of certain discriminatory fines against Plaintiff.

288.   At such meeting, and at the direction of Charles Brumsted, Jr., the Bay House President, the Committee and Ferreira did intentionally, tortuously, and illegally interfere, coerce, intimidate, threaten, and interfere with Plaintiff's exercise of her rights under the Florida Fair Housing Act by imposing unlawful and discriminatory fines against Plaintiff.

289.   Ferreira further aggressively counseled the Fining Committee on the Bylaws and Florida law, despite not being an attorney or representative of Bay House, in an effort to ensure that Plaintiff could not, and did not exercise her rights.

290.   Charles Brumsted, Jr., the Committee members, and Ferreira acted in bad faith, jointly and severally, as alleged above for discriminatory purposes.

291.   On April 9, 2020 Bay House and Charles Brumsted, Jr. sent Plaintiff a Notice of Intent to Record a Claim of Lien citing unpaid Maintenance & Special Assessments "thru April 2020" (not yet delinquent), Late Fee, Fines, Interest, Certified Mail Charges, Other Costs, and Attorneys Fees.

292.   The unpaid items that are delinquent are the illegal and discriminatory fines imposed on Plaintiff.

293. Florida 718.303 expressly states "The association may levy reasonable fines for the failure of the owner of the unit or its occupant, licensee, or invitee to comply with any provision of the declaration, the association bylaws, or reasonable rules of the association. *A fine may not become a lien against a unit*."

294. The Notice of Intent to Record a Claim of Lien is illegal and part of the greater discriminatory scheme.

295. Plaintiff has been forced to retain counsel and suffered damages as a result of the above stated events.

WHEREFORE, Plaintiff, Kanayo Derhem, requests this Court enter judgment against each respective Defendant, Bay House Condominium Association, Inc., Charles Brumsted, Jr., James Pinkert, Joshua Paul, Alejandro Enrique Utrera Badenes, and Jonathan Ferreira, award damages, punitive damages, attorneys' fees and costs, and any and all other relief this Court deems just and proper.

## COUNT 10
### Violation of Rights of Condominium Owner
### Supplemental Claim - Fl. St. §§ 718.110, 718.303 and 718.123
### [As to Defendant BHMCA]

296.  Prior to purchasing her condominium, Plaintiff verified with Bay House that short term rentals, such as those through Airbnb, were permitted.

297. Plaintiff's was contingent on short term rentals being permitted.

298. Bay House affirmed that Plaintiff could rent her prospective unit for short terms via Airbnb on two separate occasions.

299. Nothing in any Bay House governing document or regulation prohibited such short term renting.

300.   After Plaintiff purchased her condominium unit in reliance on the representations and governing documents pertaining to short term rentals, Bay House adopted new Rules and Regulations prohibiting Airbnb rentals.

301.   The Rules and Regulations prohibiting Airbnb rental materially and adversely affect Plaintiff's rights in violation of Florida Statute 718.110.

302.   Following their bad faith, illegal adoption of the Rules and Regulations, Bay House illegally deactivated Plaintiff's key fob, denying her access to certain amenities and common areas, citing the imposition of fines for violating the newly adopted prohibition on Airbnb rentals.

303.   The illegality of the actions referenced above aside, the fines were not ninety days delinquent, making the denial of Plaintiff's access to common areas and amenities a violation of Florida Statute 718.303 and Bay House's governing documents.

304.   Plaintiff has been damaged and suffers denial of her use and enjoyment of the property, and has been forced to retain counsel concerning such matters.

WHEREFORE, Plaintiff, Kanayo Derhem, requests this Court enter judgment against Bay House Condominium Association, Inc., award damages, attorneys' fees and costs, and any and all other relief this Court deems just and proper.

### COUNT 11
### Breach of Fiduciary Duty
### Supplemental Claim under Florida Common Law
### [As to Defendant Charles Brumsted, Jr.]

305.   Pursuant to Florida Statute 718.111 Charles Brumsted, Jr., as its President, owed Bay House and its unit owners a fiduciary duty.

306.   Charles Brumsted, Jr. breached his fiduciary by intentionally and willfully acting and directing others, in bad faith, to engage in illegal, fraudulent, malicious, discriminatory, and

grossly reckless behavior under the color of authority granted by the Bay House Condominium Association, Inc.

307.    Charles Brumsted, Jr. misappropriated association funds and resources for his own benefit relating to prior claims of his misconduct regarding unit owners, association officials, employees, staff and Plaintiff.

308.    Charles Brumsted, Jr. deliberately failed to keep and make available records and documents required by Florida law and Bay House Governing documents.

309.    Charles Brumsted, Jr. implemented and executed the selective and specific application of Bay House powers and authority to disproportionately target Plaintiff in retaliation for her previous disagreements, desire to be a board member; desire to participate in community activities; inquiries, reasonable and good faith complaints, etc., and to satisfy his own racial/ discriminatory biases because of her African American ethnicity and gender expression and identity.

310.    The totality of Charles Brumsted, Jr.'s actions are reckless, in bad faith, with malicious purpose, wanton, and with willful disregard of human rights, safety, and property.

311.    Charles Brumsted, Jr.'s breaching of his fiduciary duty is the direct and proximate cause of irreparable damages suffered by Plaintiff has been forced to retain counsel as a result of Charles Brumsted, Jr.'s breach.

WHEREFORE, Plaintiff, Kanayo Derhem, requests this Court enter judgment against Charles Brumsted, Jr., award damages, punitive damages, attorneys' fees and costs, and any and all other relief this Court deems just and proper.

**COUNT 12**
**Breach of Fiduciary Duty**
**Supplemental Claim under Florida Common Law**
**[As to Defendants James Pinkert, Joshua Paul and**
**Alejandro Enrique Utrera Badenes (Separately)]**

312.    Pursuant to Florida Statute 718.111 James Pinkert, Joshua Paul, and Alejandro Enrique Utrera Badenes, as members of the Bay House Fining Committee, owed Bay House and its unit owners a fiduciary duty.

313.    Each Committee member was recruited and placed on the Fining/Grievance Committee by, and at the direction of Charles Brumsted, Jr., Bay House President, for sole purpose of carrying out and furthering Charles Brumsted, Jr.'s scheme to illegally retaliate, coerce, intimidate, threaten, deny Plaintiff the exercise of her rights, and deny her human rights.

314.    Each Committee member did breach their fiduciary duties by intentionally and willfully acting in bad faith, to engage in illegal, fraudulent, malicious, discriminatory, and grossly reckless behavior under the color of authority granted by the Bay House Condominium Association, Inc.

315.    Each Committee member imposed and executed the selective and specific application of Bay House powers and authority to disproportionately target Plaintiff in retaliation for her previous disagreements, reasonable and good faith complaints, and decision to run for the board, *inter alia*, and in furtherance of Charles Brumsted, Jr.'s, and their own respective racial biases because of her African American ethnicity.

316.    Each Committee member deliberately imposed illegal fines against Plaintiff recklessly, in bad faith, with malicious purpose, wanton, and with willful disregard of human rights, safety, and property.

317.    Each Committee member's breaching of their fiduciary duty is the direct and proximate cause of irreparable damages suffered by Plaintiff has been forced to retain counsel as a result of Committee's breach.

WHEREFORE, Plaintiff, Kanayo Derhem, requests this Court enter judgment against each respective Defendant, James Pinkert, Joshua Paul, and Alejandro Enrique Utrera Badenes, award damages, punitive damages, attorneys' fees and costs, and any and all other relief this Court deems just and proper.

### COUNT 13
### Gross Negligence
### Supplemental Claim under Florida Common Law
### [As to Defendants James Pinkert, Joshua Paul and
### Alejandro Enrique Utrera Badenes (Separately)]

318.    Each and every one of the Defendants; James Pinkert, Joshua Paul, and Alejandro Enrique Utrera Badenes owed Plaintiff, Kanayo Derhem, a duty to execute their duties and responsibilities as members of the Bay House Fining Committee legally, ethically, fairly, impartially, and pursuant to governing documents of BHMCA.

319.    Defendants, James Pinkert, Joshua Paul, and Alejandro Enrique Utrera Badenes willfully and intentionally accepted appointment to Fining/Grievance Committee for sole purpose of, with instruction, understanding, and intent of maliciously continuing BHMCA President Charles Brumsted Jr.'s coercing, intimidating, threatening, interfering, and deprivation of Plaintiff's rights under Florida Statute 760, his scheme of discrimination against Plaintiff, and his retaliation against Plaintiff for her previous attempts to exercise her rights.

320.    The Committee acting on behalf of Bay House on March 20, 2020, with 2 (two) newly appointed members, Alejandro Enrique Utrera Badenes, and Joshua Paul, imposed the fines against Plaintiff.

321.    At the March 20, 2020 hearing, Plaintiff was not afforded the opportunity to be heard because the Committee incorrectly said she was given the opportunity to be heard at the prior hearing.

322.    Contrary to this assertion, Plaintiff was not given any opportunity to be heard on these new matters at the previous hearing, and she made the Committee aware of this, and her right to do so under Florida law.

323.    Despite being made aware of these facts and Florida statutes, the Committee refused to allow Plaintiff to be heard, refused to take any meeting minutes of the March 20, 2020 hearing, and entered all fines against Plaintiff.

324.    The Bay House Bylaws and Florida Statutes afford Plaintiff the right to be heard before the committee prior to entering fines against her.

325.    The Committee members acted in bad faith, jointly and severally as alleged maliciously, illegally, willfully, intentionally, and knowingly breaching the Bay House Bylaws and Florida Statutes by refusing to allow Plaintiff and opportunity to be heard and entering various fines against her.

326.    Each Committee member imposed and executed the selective and specific application of Bay House powers and authority to disproportionately target Plaintiff in retaliation for her previous disagreements, complaints, and decision to run for the board, *inter alia*, and in furtherance of Charles Brumsted, Jr.'s, and their own respective racial biases because of her African American ethnicity.

327.    Each Committee member deliberately imposed illegal fines against Plaintiff recklessly, in bad faith, with malicious purpose, wanton, and with willful disregard of human rights, safety, and property.

328.    Thus, each Committee member did breach the duty owed to Plaintiff by intentionally and willfully acting in bad faith, to engage in illegal, fraudulent, malicious, discriminatory, and grossly negligent behavior under the color of authority granted by the Bay House Condominium Association, Inc.

329.    Each Committee member's breaching of the duty is the direct and proximate cause of irreparable damages suffered by Plaintiff in the form of fines, liens, emotional distress, and having been forced to retain counsel as a result of Committee's breach. Despite being made aware of these facts and Florida statutes, the Committee refused to allow Plaintiff to be heard, refused to take any meeting minutes of the March 20, 2020 hearing, and entered all fines against Plaintiff.

330.    The actions of each Committee member were grossly negligent.

WHEREFORE, Plaintiff, Kanayo Derhem, requests this Court enter judgment against each respective Defendant, James Pinkert, Joshua Paul, and Alejandro Enrique Utrera Badenes, award damages, punitive damages, attorneys' fees and costs, and any and all other relief this Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable by a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare that the acts, practices, and omissions complained of herein by Defendants are unlawful and violate the Federal Housing Act, the Federal Civil Rights Act of 1866 and 1871, the Florida Civil Rights Act, and the Florida Condominium Act, and constitute the state law torts of breach of contract and breach of fiduciary duty;

B.      Permanently enjoin Defendants BHMCA and KWPM, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in the unlawful conduct of discriminating against residents based on race, gender, and perceived disability;

C.      Order Defendants BHMCA and KWPM to institute and carry out policies, practices, programs, and training for employees which eradicate the effects of Defendants' past and present unlawful housing practices;

D.      Order other affirmative relief necessary to eradicate the effects of the unlawful housing practices of Defendants BHMCA and KWPM;

E.      Direct all Defendants to pay for past and future compensatory pecuniary and non-pecuniary losses, including punitive damages, resulting from the unlawful practices complained of in the foregoing paragraphs, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in an amount to be determined at trial;

F.      Award Plaintiff's attorneys' fees, costs, and disbursements as provided by law; and

G.      Award such additional relief as justice may require.


Dated: June 2, 2020

                                        Respectfully submitted,


                                        ___s/ Marlin S. Muller_____
                                        Marlin Muller
                                        Bar No. 1003675
                                        The Hidalgo Law Firm
                                        25 SE 2nd Ave Suite 1235
                                        Miami, FL 33131
                                        (305) 846-9192
                                        marlin@thehidalgolaw.com

<u>   s/ Jillian T. Weiss            </u>

Jillian T. Weiss, Esq.

Pro Hac Vice Pending
Law Office of Jillian T. Weiss, P.C.
527 Hudson Street
P.O. Box 20169
New York, New York 10014
(845) 709-3237
jweiss@jtweisslaw.com

*Attorneys for the Plaintiff*