## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **MS. KANAYO DERHEM** and MR. **MOJTABA E. KOOSEJ,** | **Case No. 1:20-cv-22318-KMW** |
| **Plaintiffs,** | |
| **v.** | |
| **BAY HOUSE MIAMI CONDOMINIUM ASSOCIATION, CHARLES BRUMSTED, JR., JAMES PINKERT, JOSHUA PAUL, ALEJANDRO ENRIQUE UTRERA BADENES, JONATHAN FERREIRA, KW PROPERTY MANAGEMENT, LLC, and JOSE VIDAL,** | |
| **Defendants.** | |

## PLAINTIFFS' CORRECTED RESPONSE TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT.

Plaintiffs hereby respond to the Defendants' Joint Motion for Summary Judgment.

### STANDARD OF REVIEW OF MOTIONS FOR SUMMARY JUDGMENT

Entry of summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Summary judgment is not appropriate if a reasonable fact finder could draw more than one inference from the facts showing that there is a genuine issue of law. Jeffery v. Sarasota White Sox 64 F.3d 590, 594 (11th Cir. 1995).

1

## STATEMENT OF FACTS

Plaintiffs Ms. Kanayo Derhem (hereinafter, "Derhem") and Mr. Mojtaba E. Koosej (hereinafter "Koosej") in 2018 decided to invest in a jointly-owned residential property located in Miami, Florida. Koosej, although mostly out of state, actually located the property to be purchased, i.e. Unit 2605 in Bay House Miami Condominium building **Exhibit D, E** [1] **at paragraphs 3 and 4.**

### The purchase approval process

Both Koosej and Derhem, on January 19, 2019 each submitted an application for occupancy. Mr. Koosej's application included financial income records reflecting $250,000 in annual income. See Defendants' Exhibit 11 to Motion for Summary Judgment.[2] Twenty days came and went with little communication from the Association and without approval of the applications Finally Jodi Strang, the attorney closing agent being utilized by the Plaintiffs, sent a letter via email to the Association suggesting that delay in approval was the result of discriminatory animus and threatening suit therein **Exhibit, WW, D**. See **Exhibit WW.** In immediate reaction to Strang's email, an interview was scheduled with Plaintiffs and Brumsted for that exact same day **Exhibit E, in paragraph 6**.

During their interview, Brumsted pointedly asked Derhem whether she "could have children", a comment made in conjunction with his observation that the Bay House Miami Condominium building was a "family-oriented" building. The obvious implication of these comments was to suggest that occupancy by a transgender female would be unsuitable in a "family-friendly building" **Exhibit, D, E, III**..

---

[1] Unless otherwise indicated, references to exhibits identified with letters (A through KKKKK) are references to Plaintiffs' exhibits filed contemporaneously herewith.

[2] In contrast to Plaintiffs' exhibits, Defendants' exhibits, filed in conjunction with their Joint Motion for Summary Judgment, are numbered. References to defendant's exhibits throughout this response, unless otherwise indicated, will be to numbered exhibits filed by the Defendants in conjunction with their Joint Motion for Summary Judgment.

**Commencement of disputes**

Plaintiff Derhem commenced her occupancy of Unit 2605in February, 2019.   She immediately began seeking roommates to share her owner-occupied unit.   Fines were quickly imposed.   Letters imposing finds advised that unless the referenced fines were paid in five days, Ms. Derhem and her "guests" would immediately be excluded from the common area building amenities, which was achieved through the deactivation of the fobs of Unit 2605. See **Defendants' Exhibit 27.**

During calendar years 2019 and 2020, Unit 2605 was repeatedly fined for having roommates despite the absence of any rule, regulation, or Association document prohibiting the practice of renting an owner-occupied unit to third party roommates **Exhibit, GGGG, H, NN, SS, RR, G, UUUU**.  Furthermore, during these years (2019 through 2021) Derhem and her roommates were continuously denied access to common area amenities.  **See Derhem Affidavit, Exhibit D, at paragraph 63.**

Fines for having roommates continued up until Brumsted's resignation as President of the BHMCA BOD. Since  his resignation, Unit 2605 has  only fined 4 times in 2021 (not for illegal renters) and none in 2022. **Exhibit D** at paragraph 259**, H, KK**. Moreover BHMCA, in 2021, refunded many of the fraudulent fines that were discriminatorily levied against plaintiffs based on Brumsted and Vidal's race and sex-based animus, **Exhibit, WWWW, I, D, H, KK.**

When confronted by Derhem as to why other owners and/ or primary tenants of BHMCA units were permitted to have rent-paying roommates, Brumsted explained "I like those guys" **Exhibit, D at paragraph 143** ; **Exhibit, NN**.  At all times material hereto, at least two or more units—either owner occupied and/ or occupied by primary lessees- had roommates paying and contributing toward rent for unit residency. These other unit residents were neither Black nor were

they Transgender. See Affidavit of Kavir Rambharat, **Exhibit RR** and Affidavit of Sebastian Brayshaw, **Exhibit SS**. These other unit owners/primary lessees, like Derhem, had rent-paying roommates, each assigned their own bedrooms.  The other occupants and Derhem occupied units in the same building, governed by the same Association, subject to the same rules.  The only difference was that the other residents  were not black transgender women.

**LEGAL ARGUMENT**

**COUNT I**

**VIOLATION OF THE FAIR HOUSING ACT**

In evaluating Plaintiffs' claims thereunder, this Court should keep in mind that the Fair Housing Act is the functional equivalent of Title VII.  The provisions of these two statutes are given like construction and application <u>Fox v. Gaines</u> 4 F.4th 1293, 1296 (11th Cir. 2021) ("When interpreting the FHA, we – like our sister circuits – look to cases interpreting Title VII, which uses language virtually identical to the FHA's.")

Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, prohibits discrimination against any person in the terms, conditions, or privileges of sale of any dwelling because of race, color, religion, sex, familial status or national origin.  42 USC § 3604(b). Regulations enacted pursuant to the statutes cited above are even more specific. Code of Federal Regulation 24 CFR 100.400 in pertinent part provides:

(b)      It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of… any right granted or protected by this part.

(c)      Conduct made unlawful under this section includes, but is not limited to, the following:

(1)      Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling house or in connection with a residential real estate-related transaction because of race, color, religion, sex, …or national origin.

4

Direct evidence of discrimination will be highlighted in this response.  Circumstantial evidence of discrimination will likewise be presented herein. In addition to the foregoing, evidence will be offered demonstrating that Defendants – prior to Brumsted's resignation as President of the Association and change in management companies, engaged in a campaign of harassment— unconnected with renter issues, purposefully and maliciously designed to create such a hostile living environment for Derhem so as to drive her from the building **Exhibit, EEEEE, NN, RR, SS, OO, PP, D, E, F, G**. This campaign of harassment was motivated by Brumsted and Vidal's disgust and repulsion to Derhem's race, sexual orientation and transgender identity **Exhibit, I, BB, X, D, F, E**.

Additionally, Plaintiffs will outline a mosaic of facts – direct and circumstantial – from which a jury could reasonably infer that Defendants maliciously discriminated against Plaintiffs, particularly Derhem, and that this issue should, therefore, go forward to a jury.

## DIRECT EVIDENCE OF DISCRIMINATION

Direct evidence is evidence that proves a fact without inference or presumption. <u>Sec'y. HUD v. Collier</u> 2019 U.S. App. LEXIS 2102 (11th Cir. 2019). If the Plaintiff presents direct evidence of discrimination that meets the preponderance of evidence standard, then the evidence is sufficient to support a finding of discrimination. A plaintiff with strong direct evidence that discrimination motivated the actor's adverse action <u>does not</u> need to meet or to resort to the three-part McDonnell Douglas analysis to get to a jury regardless of whether his/ her strong evidence is circumstantial. <u>Sec'y v. HUD v. Collier</u> 2019 U.S. App. LEXIS 2102 (11th Cir. 2019), citing <u>Pinchback v. Armistead Homes Corp.</u> 907 F.2d 1447, 1452 (4th Cir. 1990); <u>Griffith v. City of Des Moines</u> 387  F.3d 733, 736 (8th Cir. 2004).

Plaintiffs submit that the following facts are direct evidence of discrimination which support Plaintiffs' contention of discriminatory violation of the Fair Housing Act:

1. The Association failed to take action on Plaintiffs' Applications for Occupancy until receipt of the Jodi Strang (Plaintiffs' Attorney/ closing agent) emailed correspondence (**Plaintiffs' Exhibit, WW**) threatening litigation, based on discrimination if the applications were not acted upon and approved. Strang's email was sent 24 days *after* the "20 days" Brumsted, on.

2. Immediately, upon receipt of Strang's email, Charles Brumsted scheduled an interview with Plaintiffs after many weeks spent in avoidance of Plaintiffs. **See Koosej Affidavit, Exhibit E** ; **Exhibit WW, TT, D**.

3. During the interview with the Plaintiffs, Charles Brumsted pointedly asked Derhem whether she could have children, an obvious reference to her transgender status. The comment was made in conjunction with his observation that the building was family orientated, implying that a family-oriented building would somehow be unsuitable for occupancy by a transgender woman. **See Derhem Affidavit, Exhibit D, at Paragraph 77 ; Exhibit E ; Exhibit I**

4. The Association, in imposing fines, prematurely – and in violation of the Bylaws of the Association – terminated access of Derhem and her roommates to building amenities, e.g. the swimming pool and gym **Exhibit HH @par. 20 (less than 90 days); Exhibit WWWW @ par. 4**. The Association Bylaws permit suspension of access to building amenities only after ninety days of delinquency of payment of financial obligations to the Association. **See Article IX – Suspension of Certain Rights, Bylaws of Bay House Miami Condominium Association, Inc. (See also F.S. 718.303 which prohibits suspension of rights of access to common area amenities until 90 days of delinquency in paying monetary obligations to an association expire.**

6.      As the dispute over renters intensified, KW and BHMCA personnel, on occasion, denied Derhem access to her Unit, forcing Derhem  to  climb twenty-six  stories to reach her unit. **Derhem Affidavit, Plaintiffs' Exhibit D, paragraph 275 ; Exhibit IIII; VVV.** Denial of access to a Unit is a prohibited practice. **See Article IX – Suspension of Certain Rights. Defendant's Exhibit 1, bate stamped 0004000. See also F.S. § 718..303.**

8,      The Declaration of Condominium does not prohibit – and indeed contemplates – rental of owner-occupied units to third party lessees.  **See, e.g. Article  XXI of the Declaration of Condominium which at paragraph 1 provides:**

9.      On Dec. 11, 2019, Brumsted (President of the Association) confronted Derhem in the lobby area where she was speaking with another unit owner, a Black Gentleman named Mr. Brown. In a loud aggressive voice Brumsted asked Derhem whether Mr. Brown was another one of Derhem's purportedly "illegal AirBnB renters." After Brumsted was advised that Mr. Brown was a recent purchaser, Brumsted apologized, but a few moments later, while waiting for an elevator, he yelled again and sarcastically suggested that Ms. Derhem should sue the elevator for discrimination related to the elevator's slow arrival.  **See Brown Affidavit Exhibit X ; Derhem Affidavit Exhibit _D**

10.      Brumsted and Vidal frequently referred to Derhem as a "disgrace to the building". **See Derhem Affidavit, Exhibit D, at paragraphs 50, 78, 79, 88, 136 and 185. Exhibit, BB**

11.      While Brumsted punished Derhem for her practice of renting her owner-occupied unit to third party roommates, Brumsted not only permitted similar practices by other unit owners/prime lessees of other units, he facilitated the practice by assisting those unit owners/primary lessees in renting their resident-occupied units to roommates**. See Kavir Affidavit, Exhibit RR and Sebastian Affidavit, Exhibit SS ; Exhibit, GGGG  ; Exhibit, NN**

12.      When confronted by Derhem regarding Brumsted's disparate treatment regarding the permissibility of other unit owners who were neither transgender nor black to have rent-paying roommates, Brumsted explained that, unlike his feelings for Derhem, he "likes those guys."  **See Derhem Affidavit, Exhibit  D, paragraph 143 ; EX_NN, SS, RR, GGGG**

13.      Mr. Vidal was the Building manager who worked for KW.  On one occasion Derhem went to Mr. Vidal's office to ask a question regarding the many election-related emails to which he refused to respond. **Exhibit, PPP.**  Mr. Vidal immediately confronted Derhem with a "pre-transition photograph" showing Derhem as a man.  Through his body language and facial expression Mr. Vidal displayed disgust with Derhem's transgender identity.
**See Derhem Affidavit, Exhibit  D, paragraph 137.**.

14.      On another occasion, Derhem went to Mr. Vidal's office with a question.  The brief meeting deteriorated when, Vidal yelled and screamed at Derhem and proceeded to call the police. The police officer told Mr. Vidal that there  was no legitimate reason to call the police. **Exhibit, OO, LL, D  paragraph 136.**  On a separate occasion, and at Brumsted's directive, BHMCA and KWPM called the police on Ms. Derhem following the arrival of Derhem's nail technician to her home to provide manicure services. **SEE Exhibit D paragraphs 305 and 306, O and D**

15.      KW staff manning the front desk refused, on multiple occasions, to provide concierge services to Derhem. **See Derhem Affidavit, Exhibit, D, paragraphs 87, 117, 118, 300, 301, and 302**. On December 25, 2019, while her mother was visiting, her mother and Derhem were at the front desk. The KW employee from an employee named Sarah Lopera advised Derhem that she would not provide concierge services to Derhem and further stated that her supervisors were aware of and approved her refusal to provide concierge services to Derhem. **Exhibit, F** . On yet another separate occasion, this time in front of an un-interested and not materially-involved

witness, Sara again refused service to Ms. Derhem. When Derhem raised this incident with Brumsted, upon his arrival to the scene, he responded with laughter and stated he wasn't going to get involved. **See Derhem Affidavit, Exhibit D, paragraph 118, ; See also Affidavit of Dr. Onyekwuluje Affidavit, Exhibit F ; See transcript from the incident with Brumsted's arrival_ Exhibit, BBB.**

16.     Following the December 30, 2019 Fining Committee Meeting, Brumsted entered the room after the meeting and  berated the two committee members in attendance for not confirming the fines against Derhem. During this exchange, Brumsted referred to Derhem as a "monkey". **See Derhem Affidavit Exhibit D, paragraph 61; SEE Derhem's contemporaneous notes detailing the event in real-time as it happened _ Exhibit FF ; Exhibit, AAAAA.**

17.     On March 19, 2020, a Fining Committee hearing was attended by Derhem and her attorney Marlin Muller.  As confirmed in Mr. Muller's Affidavit, **Exhibit**, **ZZZ**, Derhem was not allowed to participate in the hearing which deprived her of any due process.  **See also Derhem Affidavit Exh D,  Paragraph 270**.  The right of unit members to  participate in fining committee hearings considering   whether to confirm Board imposed fines is found in **Article IX of the Baylaws, Defendants' Exhibit 1, at bate stamped page 000400.**

18.     The Association called a tow company and had Derhem's automobile, properly parked in her unit assigned parking place, towed.  At **See Derhem Affidavit D. paragraph 294 ; Exhibit**, **QQQQ.**

19.     On multiple occasions Brumsted, BHMCA president, referred to Derhem as a "disgrace to the building". See prior references to "disgrace" remarks. **Exhibit BB; Exhibit D, paragraphs 50, 78, 79, 88, 135.**

20.      On multiple occasions Brumsted, Vidal and KW personnel called the police falsely alleging that Ms. Derhem was not a unit owner and was not entitled to be in the building. **See Derhem Affidavit, Exhibit D, paragraphs 17, 52, 131, and 136. L ; Exhibit, O.**

Following Brumsted's resignation as President of the Association, in July 2020, Unit 2605 received no further fines for illegal renters.  See Tenant Register for 2020 through March 2021.  In fact, the ledger reflects that on March 11, 2022 the Association refunded numerous previously and fraudulently imposed fines crediting the account of Unit 2605.  Exhibit **WWWW @par 4**, the Resident Transaction Report **Exhibit WWWW** ;   **Also see Affidavit of Derhem, Exhibit D paragraphs 174, 263, 321.**.

.Although Plaintiffs' practice of renting their owner-occupied Unit to rent-paying roommates has remained consistent since 2019, no fines for illegal renters  have been imposed since the resignation of Brumsted as President of the Association. **Derhem Affidavit, Exhibit D, paragraph 241.**

## POST ACQUISITION CONDUCT

Defendants in their motion suggest that post-acquisition conduct will not support a claim for violation of the Fair Housing Act.  The Eleventh Circuit has rejected this proposition, noting the broad language of the statute and the legislative intent to end discrimination in housing.  ed in <u>Ga. State Conf. of the NAACP v. City of LaGrange</u>  940 F.3d 627, 633 (11th Cir. 2019).

The expansive reach of the statue is further demonstrated by regulations enacted by Housing and Urban Development (hereinafter, "HUD") pursuant to the statute. See Code of Federal Regulations 24 CFR 100.400 addressing discriminatory conduct under the Fair Housing Act.

## The McDonnell Douglas Analysis

Defendants' core allegation in seeking application of the McDonnell Douglas Analysis is the contention that the Plaintiffs violated rules restricting the rental of owner-occupied renters to third-party roommates; that the rules were consistently applied to all unit owners; and that their imposition of fines and limitations on Plaintiffs were non-discriminatory and not in violation of the Fair Housing Act.

However, the documents of the Association do not prohibit the practice  of renting an owner-occupied unit to rent-paying roommates.  **Exhibit GGGG**. The only restrictions cited by the Defendants are prohibitions against short-term hotel like rentals.  The allegation that the Plaintiffs were engaged in short-term hotel-like rentals is unsubstantiated and, in any event, is denied**.  See Derhem Interrogatory Answers, <u>Defense Exhibit 17</u>.**

In regard to the rental of an owner-occupied unit to third-party roommates,  Mr. Brumsted and the Association have, in the past, cooperated with unit owners/primary lessees who wished to rent their resident-occupied unit to other third-party roommates. See the affidavit of Sebastian Brayshaw, **Plaintiffs' Exhibit SS**  and the affidavit of **Rambharat Kavir, Plaintiffs' Exhibit RR**. When asked why he (Brumsted, on behalf of BHMCA) did not object to the actions of Mr. Kavir in also having rent paying roommates, Mr. Brumsted explained that "he likes those guys" **Exhibit, NN** ; **See Affidavit of Derhem, Plaintiffs' Exhibit D  at paragraph  143, Exhibit RR ; Exbibit SS. ; Exhibit G ; Exhibit E.**

**Prohibition of roommate occupancy was a pretext for discriminatory behavior.**

Throughout the occupancy of her unit, Derhem was repeatedly fined for having "unapproved" renters in her unit. She and her roommates were consistently denied access to common area amenities (for over three years of residency) until the Spring of this year when the

Association reactivated the fobs issued to her unit thereby enabling Derhem and her roommate's access to common area amenities. **Derhem Affidavit, Exhibit D, paragraph 253**.

The pretextual nature of the Board's explanation for the fines and denial of access is illustrated by the refusal of the Association or the management company to consider Derhem's prospective roommates for approval.   Brumsted's response to Derhem's complaints was his advice that Derhem vacate the property and abandon her unit, thereby fulfilling Brumsted's desire to rid the BHMCA community of the source continuously fueling his unwarranted and unapologetic race and sex-based animus (Derhem). **SEE Exhibit NN, EEEEE, I**

 The pretextual nature of these "offenses" is illustrated by the fact that amenity access was recently, unilaterally restored by reactivation of the fobs issued to Derhem's unit. **Derhem Affidavit, Exhibit D, paragraph 253**.  The Tenant Transaction Ledger for calendar year 2020 and for the first three months of March 2021 reflects credit refunds to Plaintiffs' account, reflecting reimbursement of fines paid in the past for, among other things, having illegal renters. **Plaintiffs' Exhibit WWWW, paragraph 4**.

### Hostile Living Environment

The Fair Housing Act prohibits acts which subject a complainant to a hostile living environment as a result of the complainant's protected status.  In <u>Fox v.  Gaines</u> 4 F.3d 1293 (11th Cir. 2021) the Eleventh Circuit Court of Appeal acknowledged that sexual harassment constitutes a form of sexual discrimination prohibited by the Fair  Housing Act. Citing to <u>United States v. Hurt</u> 6y76 F.3d 649,  654 (8th Cir. 2012) the Eleventh Circuit agreed that "Sexual harassment is actionable under the FHA when it creates  a hostile housing environment or constitutes quid pro quo sexual harassment."

In the case at bar, Plaintiffs allege that the loathsome acts described above – unrelated to the disputes regarding sharing of Plaintiffs' unit with roommates – created a hostile living environment which drove Ms. Derhem to distraction and extreme emotional distress **SEE EX, D, E, F, ZZZ, G, X**. The actions were both subjectively and objectively of sufficient severity to support a claim of discrimination resulting in a hostile living environment for Ms. Derhem.

The objective criteria are satisfied by the nature of the actions of Defendants which would be sufficiently egregious and severe to drive a reasonable person from the Building. Examples of that behavior are set forth above. The egregious behavior clearly satisfies any objective standard as bearing offensive and intolerable to a reasonable person.

The behavior complained of was also subjectively severe and offensive. As a result of this behavior, Ms. Derhem became suicidal; experienced significant weight gain; experienced bouts of numbing depression and continuous emotional distress and dental health issues **See Derhem Affidavit, Exhibit D, at  paragraphs 4, 5 and 14. See Dr. Onyekwuluje Affidavit, Exhibit F.**

### The Mosaic  Evidence of  Discrimination

Satisfaction of the criteria set forth in the McDonnell Douglas analysis is not the only avenue for pursuing claims of discrimination in the context of the Fair Housing Act. If through circumstantial evidence a plaintiff presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by a decision maker, the issue must be submitted to a jury for determination.

This approach to claims of discrimination was adopted by the Eleventh Circuit in <u>Jenkins v.  Nell</u> 28 F.4th 1243(11th Cir. 2022). In that case, the Eleventh Circuit  held  that even if  a plaintiff  fails to satisfy the McDonnell Douglas framework for proving prohibited discriminatory behavior, a claim can still survive summary judgment if the claimant can establish sufficient

circumstantial evidence of discrimination to create a trial issue concerning the decision maker's discriminatory intent.  A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker.  A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated individuals, and (3) pretext.  26 F.4ᵗʰ at 1250.

Based upon all of the foregoing, it is clear that KWPM, BHMCA and other defendants by and through the actions and directives of Brumsted and Vidal, who were motivated by discriminatory animus to Derhem, due to her identity as a transgender black woman, violated the rights of Plaintiffs in violation of the Fair Housing Act.  The Motion for Summary Judgment should be denied.

### COUNT III

Count III of the Second Amended Complaint alleges that the egregious violation of the rights of Plaintiffs – especially those of Derhem – by, inter alia, imposition of illegal fines and denial of Derhem's due process rights, were facilitated by certain members of the fining committee and  by the Association in ratifying Brumsted's demands for the imposition of fines and termination of access  to common area amenities.  In the Motion for Summary Judgment, Defendants argue that there is "not  a scintilla" of evidence that the Defendants were acting in concert in imposing fines and other sanctions, in a discriminatory manner, against Plaintiffs, especially Derhem.

The arguments raised by Defendants in seeking summary judgment as to Counts III and IV are fully addressed in arguments raised in connection with Count I, violation of the Fair  Housing

Act.  Plaintiffs have fully documented the impermissible  conduct of Brumsted, individual members of the fining committee, and the Association  which, acting in concert, imposed illegal fines and restriction of  access to the common areas as  a result of discriminatory animus directed to Derhem.

The arguments raised in Count I will not be restated herein.  By way of example however, the following behavior is more than enough to sustain the claims asserted in Counts III and IV:

1. Brumsted and the Association through their wrongful interpretation of the rules and regulations of the Association imposed fines on the Plaintiffs for renting their owner  occupied unit to rent-paying roommates. Sanctions included denying Plaintiffs and their roommates to common area amenities for most of the initial  two year ownership of Unit 2605.

2. The "rules" Brumsted and the Association, affirmed by the members of the fining committee were not uniformly applied.  As discussed in detail  earlier in this response, occupancy of other units by unrelated multiple rent paying roommates was  permitted and facilitated by Brumsted.

3. The restriction of access to the common areas was illegally imposed, both by the Association in imposing fines and in requiring payment of fines within five days of confirmation of the fines by the fining committee.  This practice, which required the joint participation of the Association and the fining committee, greatly diminished the value  of Unit 2605 to the Plaintiffs.

4. Members of the fining committee denied Derhem's right to participate in fining committee hearings in violation of  her due process rights.  See discussion of the March  19, 2020 disciplinary hearings addressed earlier in this Response.

5. Premature termination of  rights to access  to common area amenities, i.e. termination of access within five days of the imposition of fines.

Brumsted's efforts to drive Derhem from the building as a result of his discriminatory animus would have been greatly impeded, but for the illegal and improper participation of the Association and some members of the fining committee acting as tools to facilitate his vendetta.

Brumsted would never have been able to destroy the quality of life of Derhem living in Unit 2605 but  for the active cooperation and assistance of the Association and members of the fining committee itself.  The only surprising fact in all of this is Brumsted's failure in his attempts to drive Derhem from the Building.  She persevered.

## COUNT IV OF THE SECOND  AMENDED COMPLAINT

In Count IV, Plaintiffs have asserted a claim for damages arising out of the Association's actions in fining, discouraging and  interfering with Plaintiffs' efforts to procure rent-paying roommates to share occupancy of Unit  2605.  As alleged in Count IV,  and as affirmed throughout Derhem's extensive affidavit, Exhibit D, Plaintiffs purchased Unit 2605 with the intent and expectancy that occupancy of that unit would be shared by Derhem and rent-paying occupants. Brumsted,  President of the Association, persistently opposed that practice and interfered with Derhem's efforts in residing in  the unit with roommates. The Association in turn fully supported the actions of its President and repeatedly imposed fines on Unit 2605 for having rent-paying roommates sharing occupancy of the unit with Derhem.

The Association's punitive response was not limited to imposing fines. The Association in conjunction with the fines denied access to Derhem and her roommates to common area amenities if the fines were not paid within five days of confirmation by the fining committee.  This practice was in direct violation of the Bylaws of the  Association and Fla. Sta.e § 718.303 both of  which prohibit suspension of access to amenities for non-payment of  fines prior to ninety days of delinquency.

Defendants in their Motion for Summary Judgment try to circumvent the ninety day rule by noting that denial of access to amenities can be justified by rule violations. However, the letters from the Association make suspension of access to amenities contingent on payment of fines – not upon ceasing violations of rules. See Defendants' **Exhibit 27**. Accordingly the suspension of access was tethered exclusively to payment of fines, e.g. financial obligations due the Association. Suspension of access to amenities prior to ninety days of delinquency is improper.

Defendants in defending the Association's decisions regarding fining Plaintiffs for obtaining rent-paying roommates focus exclusively on Section XXII(2) on page 32 of the Declaration of Condominium, Defendants' Exhibit 1. That subsection prohibits short term hotel like rentals: "No unit shall be leased or rented by the Unit Owner for transitory or hotel purposes, which are hereby defined as (a) rentals for less than thirty (30) days or (b) rentals where the occupants of the unit are to be provided services, such as maid service of furnishing of laundry or linens."

In Plaintiff Derhem's Supplemental Responses to Interrogatories, Defendants' Exhibit 16, she is asked at Interrogatory 12, to identify the dates of occupancy of all renters who had resided in Unit 2605. In her answer, Ms. Derhem identifies 10 renters who have co-occupied her unit for varying lengths of time. Only one renter, Alan Avila, resided in the unit for less than thirty days.

Notwithstanding, the Association imposed fines for violations of Section XXII (2) from early in the Derhem's occupancy of Unit 2605 through July, 2020. See Unit Transaction Ledger, Plaintiffs' Exhibit XXXX. Furthermore, although the Association imposed fines on different occasions, all of which were ultimately paid, there was never any restoration of rights to access following payment of fines for alleged illegal renters. Denial of access to common area amenities

17

persisted unabated throughout Derhem's occupancy of Unit 2605 until the Spring of 2022 when the fobs allowing access to amenities were unilaterally restored by the Association, permitting access to common area amenities by all residents of Unit 2605.

Indeed, the governing documents of the Association appear to contemplate co-occupanccy by owners with rent paying roommates. For instance, Article XXII of the Declaration of Condominium, Section 3, in the final sentence of the final separate paragraph, provides: "The Association shall have the right to adopt rules to prohibit dual usage by a Unit Owner and a tenant of Common Elements otherwise readily available for use generally by Owners." If occupancy of a unit by the owner and by tenants was prohibited by existing rules and regulations of the Association, the issue addressed in the quoted sentence would have no purpose. Furthermore, no rules prohibiting dual usage and access to common area amenities by unit owners and their tenants residing in an owner occupied unit have been enacted.

In summary, it is apparent that Unit 2605 has been repeatedly fined for having roommates when the record reflects only one early instance of occupancy by a roommate for less than thirty days. Notwithstanding the intermittent occupancy of Unit 2605 by various renters, Ms. Derhem and any roommates have continuously been denied access to common area amenities since the issue first arose. These actions have clearly resulted in financial damages, as rentals charged to roommates forced Plaintiffs to reduce rent charged to roommates for the privilege of residing in Unit 2605. As importantly this practice has materially interfered with Derhem's enjoyment of her Unit and the building amenities, which in large measure induced her purchase.

Defendants also argue that there was no showing of arbitrary non-uniform enforcement of the subject rule prohibiting short term rentals. That of course is not true. See earlier portions

of this memorandum addressing Mr. Brumsted's accommodation of other units in having rotating occupancy by rent paying roommates.   Of course, Mr. Brumsted liked those guys.

## COUNT V

Count V of the Second Amended Complaint alleges a claim against Brumsted, alleging that while acting as President of the Association, breached his fiduciary duties owed to Plaintiffs. The Joint Motion for Summary Judgement alleges that there is not a "scintilla of evidence" that Brumsted violated any common law or statutory fiduciary duty owed the Plaintiffs. This argument cannot stand in view of the highly detailed examination of the history of Brumsted's discriminatory behavior directed toward Derhem.

The history of the creation of a hostile living environment by Brumsted to be endured by Derhem is fully documented in earlier portions of this Response. His behavior included the inconsistent application of rules and sanctions against Derhem, not imposed against other units in the building; interference with fining committee members and committee activities to ensure that the sanctions he imposed would be imposed; his slanderous remarks made from time to time to or regarding Derhem; his expressions of racial and sexual identity animus found in his social media posts; his participation in having Derhem's car illegally towed from the building garage as "abandoned." These incidents – and so many other highlighted in earlier portions of this memorandum demonstrate far more that a "scintilla" of evidence of discrimination actions taken by Brumsted in violation of his fiduciary obligations to Derhem as President of the Association.

## CONCLUSION

Defendants' Joint Motion for Summary Judgment should be denied in all respects.

Respectfully submitted,

SIMON, SCHINDLER & SANDBERG LLP

Attorneys for Plaintiffs.
2650 Biscayne Boulevard
Miami, FL 33137
Tel:     (305) 576 1300
Fax:     (305) 576 1331
Email: Rschindler@miami-law.net
rjsassist@miami-law.net


By:   /s/ Roger Schindler /s/_____
ROGER J. SCHINDLER, ESQUIRE

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of  the foregoing was served via CM/ECF on

September 8th, 2022 on all counsel or parties of record on the Service List below.


SIMON, SCHINDLER & SANDBERG LLP
Attorneys for Plaintiffs.
2650 Biscayne Boulevard
Miami, FL 33137
Tel:     (305) 576 1300
Fax:     (305) 576 1331
Email: Rschindler@miami-law.net
rjsassist@miami-law.net


By:   /s/ Roger Schindler /s/_____
ROGER J. SCHINDLER, ESQUIRE
Florida Bar No. 124726

## SERVICE LIST

Evelyn Greenstone Kammet
Vernis, Bowling of Miami, P.A.
1680 NE 135th Street
Miami, FL 33181
egreenstone@florida-law.com
egkfiling@florida-law.com
Waynice Green-Musgrove, Esq.
wgreen-musgrove@florida-law.com
yordaz@florida-law.com

Craig J. Shankman
William Thomas Leveille, II
Boyd Richards Parker & Colonnelli, P.L.
100 SE 2nd Street, Suite 2600
Miami, FL 33131
cshankman@boydlawgroup.com
wleveille@boydlawgroup.com

*Counsel for Charles Brumsted, Jr.*

*Counsel for Defendants BHMCA, Sean Zahniser, James Pinkert, Alejandro Enrique, Uterera Badenes and Joshua Paul*

Jean Anne Hanrahan
Marshall Dennehey Warner Coleman & Goggin, P.C.
100 N.E. 3rd Avenue, Suite 1100
Fort Lauderdale, FL 33301
jahanrahan@mdwcg.com
jjvogel@mdwcg.com

*Counsel for Defendants KW Property Management, LLC, Jose Vidal, and Jose Ferreira*